STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**13-1104**


CLEO ALEXANDER

VERSUS

PEERLESS CLEANERS


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT NO. 2
PARISH OF AVOYELLES, NO. 12-07926
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and James T. Genovese, Judges.


**AFFIRMED.**


**Ernie Lynn Vallery
526 Murray Street
Alexandria, LA 71301
Telephone:  (318) 442-6565
COUNSEL FOR:
        Plaintiff/Appellant - Cleo Alexander**

**Bradley John Gadel
Bradley J. Gadel, APLC
728 Jackson Street
Alexandria, LA 71301
Telephone:  (318) 448-4406
COUNSEL FOR:
        Defendant/Appellee - Peerless Cleaners**

**THIBODEAUX, Chief Judge.**

The claimant, Cleo Alexander, appeals the judgment of the Office of Workers' Compensation dismissing his suit against his employer, Peerless Cleaners ("Peerless" or "the laundry"). The workers' compensation judge concluded that Mr. Alexander did not prove the occurrence of a compensable accident. We affirm the judgment.

## I.

## ISSUES

We must decide:

(1) whether the trial court manifestly erred in finding that Mr. Alexander did not meet his burden of proving that he suffered a compensable accident while in the course and scope of his employment with Peerless Cleaners; and

(2) whether Mr. Alexander filed a frivolous appeal and is therefore liable for sanctions.

## II.

## FACTS AND PROCEDURAL HISTORY

The case before us is particularly difficult because of the unusual relationship between the claimant, Mr. Cleo Alexander, and the Peerless owner, Mr. Johnny Regard. Mr. Alexander, age fifty-three, and Mr. Regard, age sixty-eight, worked together side by side in the back of the laundry for many years. Mr. Regard's grandfather started the business, and Mr. Regard had run it for over forty years. Mr. Regard testified that Mr. Alexander was one of the best employees that he had ever had. He was smart and dependable, and he had been employed there for fourteen years. Mr. Alexander had two years of college and had done other

things, but he liked being at home in the afternoons; and he was a good shade-tree mechanic. Basically, he worked from 7:00 a.m. until noon at the laundry Tuesday through Friday; he also worked for a couple of hours on Monday mornings when the laundry was closed.

Mr. Alexander arrived first every morning and started the operation of washing, handling buckets of detergent and starch, and then pressing and ironing. Sometimes he did dry cleaning duty. The female employees usually arrived at 7:30 a.m., took turns working in the back, and then worked the front counter until 5:00 p.m. It was a small operation, and teamwork was evident. Mr. Alexander wrapped up the laundry operations in the back, turned everything off, and was last to leave the area, clocking out around twelve, give or take an hour. If something came up later in the day, Mr. Regard would call, and Mr. Alexander would come back with help if the task required moving anything heavy.

Such was the case on Tuesday, February 28, 2012. Mr. Alexander clocked out at 1:21 p.m. after helping two deliverymen offload an electronic carousel that Mr. Regard had purchased for the laundry. It was a long, gangly piece of equipment, disassembled, and only about two feet high, but over ten feet long, with a motor at one end, and weighing around 200 pounds altogether. After it was offloaded from the trailer, the equipment sat in the parking lot in front of the laundry. Mr. Regard called Mr. Alexander around 3:30 p.m. and asked him to come back with a couple of men to help move the carousel into the storage building across the street from the laundry.

Mr. Alexander went to the home of Ricky and Logan Channel, two brothers who had helped move things in the past. Ricky Channel went with Mr. Alexander. Logan did not arrive timely. Mr. Alexander, Mr. Regard, and Ricky

Channel ultimately moved the equipment themselves. Ricky Channel, an apparently robust and able-bodied sixty-two-year-old, took the heavy end, and Mr. Alexander, a slighter built individual, took the lighter end. Mr. Regard helped with the light end and in the middle with a dolly. The three men pushed the equipment across the pavement, over some grass or shells, and finally into the storage building, a total of at least eighty yards. The carousel fell off the dolly a few times and had to be realigned. No one complained of being hurt during or after the offloading process around noon, and no one complained of being hurt during or after moving the equipment into storage later that afternoon.

Mr. Alexander worked every day as usual. He later complained that his back hurt, but he did not report an injury. He thought he had pulled a muscle and sought medical attention on his own at Huey P. Long Hospital (Huey P. Long), where he denied trauma or injury of any kind. Mr. Alexander subsequently asserted that he told Mr. Regard that he was hurt at work, which Mr. Regard denies.

Mr. Alexander filed a 1008 in November 2012, asserting that he sustained a work injury in mid-February; that no benefits had been paid; that no medical care had been authorized; and that he was unable to work more than half days due to disabling pain. Mr. Regard answered the suit asserting that Mr. Alexander was still fully employed; that he was not disabled; that he had not reported a work injury; and that he had not asked for medical authorization.

Mr. Alexander was paid $8.00 an hour for thirty-six hours per week. Pursuant to his time cards, he worked only twenty hours per week. He testified that he received $70.00 or $80.00 per week in additional cash in a separate envelope through December 2012, though this amount is not documented. Except

3

for holidays, Mr. Alexander missed five days of work in 2012. On one of those days he had a colon screening at Huey P. Long; and the last day missed was the day after Thanksgiving. Mr. Alexander continued to work through March 2013.

On March 27, 2013, thirteen months after the incident on February 28, 2012, Mr. Alexander wrote a letter to Mr. Regard, stating that he was unable to work any longer. There were no medical reports to support a disability.

On April 3, 2013, pursuant to a court-ordered evaluation by his physician of choice, Mr. Alexander saw Baton Rouge orthopedist Dr. Kevin McCarthy. Dr. McCarthy related Mr. Alexander's problems to the incident with the carousel based upon the history given, but his concerns were with Mr. Alexander's cervical and thoracic spine, not his lower back.

Following a June 2013 trial and the testimony of co-workers, family members, and Ricky Channel, the trial court found in favor of Peerless Cleaners and dismissed Mr. Alexander's claims. For the following reasons, we must affirm.

III.

**STANDARD OF REVIEW**

In deciding workers' compensation cases where, as here, the accident is unwitnessed, *Bruno v. Harbert Int'l Inc.*, 593 So.2d 357, 361 (La.1992), has enunciated the trial court's function and the appellate court's standard of review:

> In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of this testimony." *West*, 371 So.2d at 1147; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987). The trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on

4

review unless clearly wrong or absent a showing of manifest error. *Gonzales v. Babco Farms, Inc.*, 535 So.2d 822, 824 (La.App. 2d Cir.), *writ denied*, 536 So.2d 1200 (La.1988) (collecting cases). . . .

Attempting to give meaning to the nebulous terms "clearly wrong" and "manifest error," we recently enunciated the following general principles . . . :

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. <u>Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story</u>, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell v. Esco*, 549 So.2d 840, 844-45 (La.1989) (citations omitted and emphasis supplied).


IV.

**<u>LAW AND DISCUSSION</u>**

*Applicable Law*

The worker in a compensation action must establish the threshold requirement that he suffered a "personal injury by accident arising out of and in the course of his employment." La.R.S. 23:1031. "'Accident' means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or

violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.R.S. 23:1021(1).

In *Bruno*, 593 So.2d at 361, the Louisiana Supreme Court articulated the claimant's burden of proof and the criteria to be used by the courts in determining whether an unwitnessed but compensable accident has occurred:

> Despite the liberal construction of the statute afforded the worker in a compensation action, the worker's burden of proof is not relaxed. *Prim v. City of Shreveport*, 297 So.2d 421 (La.1974). Rather, as in other civil actions, the plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. *Id.*; *Nelson*[*v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991)]. A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, *13 Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses or friends. [*Id.*]; *Nelson*, [588 So.2d 350]. Corroboration may also be provided by medical evidence. *West*, [371 So.2d 1146].

After applying the *Bruno* criteria, the trial court found that Mr. Alexander failed to prove a work-related, compensable injury by a preponderance of the evidence. The record supports this conclusion as (1) other testimony and medical evidence discredited and cast serious doubt upon Mr. Alexander's version of the incident; and (2) the circumstances following the incident did not corroborate Mr. Alexander's testimony.

## *Other Evidence*

It is undisputed that Mr. Alexander did not tell the owner, Mr. Regard, or anyone else that he hurt his back when he helped offload the carousel at noon on the Tuesday of the incident on February 28, 2012. Nor did he say anything that afternoon when he went back to help move the equipment into storage. Further, when Mr. Alexander went to Huey P. Long Hospital for lower back pain almost three weeks later, he denied trauma or injury of any kind. Even later, he could not describe or identify a specific precipitous event under La.R.S. 23:1021(1) when he felt the pain that allegedly would disable him after continuing to work for over a year. He eventually testified that he thought he had pulled a muscle lifting the equipment the first time, but he wasn't sure exactly when, and he did not think much of it at the time.

There were numerous discrepancies, and the trial court had to resolve many conflicts in the testimony, both large and small. Mr. Alexander said he and one driver and Mr. Regard offloaded the equipment the first time. Mr. Regard said there were two men in the delivery truck and trailer, not one; and Mr. Regard said that he himself did not help because he went inside to write the check for the delivery. When he came out, the carousel was unloaded and on the ground.

Mr. Alexander testified that when he came back in the afternoon with Ricky Channel, Mr. Regard "got in a hurry" and insisted on the three of them (Alexander, Channel, and Regard) going ahead without waiting for the second Channel brother to arrive. Mr. Regard testified that it was Ricky who did not want to wait for his brother and that Ricky started boasting that he could do the whole thing by himself even if Mr. Alexander and Mr. Regard climbed on top of the carousel. There was apparently laughter and kidding. Mr. Alexander admitted to

having a beer when he got off work, and Ricky Channel admitted to being a beer drinker too. Ricky Channel confirmed that he said Mr. Alexander might be too light to handle the equipment. Ultimately the three men, Ricky Channel, age 62, Mr. Regard, age 68, and Mr. Alexander, age 53, pushed the equipment into the storage building. The carousel fell off the dolly a few times, but no one complained of injury, and no one dropped the equipment because of pain.

*Post-Accident Circumstances*

After the incident on Tuesday, February 28, 2012, Mr. Alexander continued to work the rest of the week, and on into March of 2013, missing only a few scattered days of work. He testified that he could not get out of bed the weekend after the incident. His wife and step-daughter, who lived with him at the time, testified that he stayed in bed that weekend, which was unusual for him. At some point, Mr. Alexander developed a limp. His wife, his step-daughter, and his brother all testified regarding Mr. Alexander's decline in health, but the time line and the sequence of events were muddied, rather than clarified. Mr. Alexander's step-daughter said he told her mother about the work accident six or seven months before trial, which would have been November or December 2012, but Mrs. Alexander said he told her the weekend after the incident—in March 2012.

Mr. Alexander testified that the Monday after the Tuesday incident, he told Mr. Regard that his back hurt. Mr. Regard gave him ointment that he had used for his own backaches, but Mr. Regard said that event did not occur until about three weeks after the incident. Mr. Alexander's step-daughter testified that in February or March 2012, Mr. Alexander started walking differently, but later testified that the limp probably started in June. Mr. Alexander's brother testified

that he noticed the limp and talked to Cleo about the possibility of a stroke before Easter, but his concerns escalated on Good Friday, April 6, when Cleo could not get out of a chair and had to be carried to his brother's vehicle. Mr. Alexander had worked, as usual, the day before the holiday on Good Friday.

Mr. Alexander's 2012 medical records do not support a work-related injury. He was seen at Huey P. Long on March 18 for low back pain and pain in his right leg and hip, but he denied any trauma, injury, or functional restrictions. X-rays revealed chronic arthritic changes with spurring and decreased disc spaces. The diagnosis was sciatica. A lumbar MRI was ordered because of the sciatica; a cancer screening was ordered because of a reported ten-pound weight loss. Mr. Alexander had the MRI on April 23 and learned on May 2 that he had minimal broad-based disc protrusions at L2-3, L3-4, and L4-5, with an otherwise normal MRI and no spinal stenosis. He returned to Huey P. Long on July 30, complaining of right-sided weakness and numbness in his right leg and arm. At each of the visits to Huey P. Long, Mr. Alexander was ambulating without difficulty, had full range of motion, and there is no mention of a work injury.

Mr. Alexander said that he told Mr. Regard in May that he was injured moving the carousel in February, because when he got the MRI results he realized that he had more than a pulled muscle. He said Mr. Regard accused him of wanting free money and refused to send him to the doctor. Mr. Regard denies that Mr. Alexander reported a work injury or asked for medical care and further said that he offered to pay the $80.00 for the MRI that Mr. Alexander had mentioned. At trial, Mr. Regard testified that Mr. Alexander had a drinking problem which caused him to be physically weak, and that he had hired helpers to do the heavy lifting for him for the last two years. The medical records indicate

9

that Mr. Alexander drank seven or eight beers daily and smoked one to two packs of cigarettes a day.

Long-time coworkers Mary Nell Decuir and Brenda Landry both testified by deposition that Mr. Alexander was a good worker who always did his job and got along well with everyone. However, neither of them knew that he had been hurt. Neither of them knew of him telling anyone at work that he had an accident or was experiencing pain, though it was a small place where they all helped each other. Ms. Decuir testified that she was working at the front counter and saw the men moving the carousel across the street. She saw it fall, and she saw them pick it up and keep going. She said that she did not see an accident; that Mr. Alexander never complained about pain; that he never slowed down; and that he just suddenly stopped coming to work. Ms. Landry never noticed him walking in an unusual manner. Ms. Decuir became aware at some point that he had a stiff leg, but she never really noticed "that's how he walked."

David Vasquez was a former employee who had worked with Mr. Alexander in the back of the laundry three days a week. He testified that he thought Mr. Alexander told him about the incident, and that he was hurt, the day after the incident occurred, or six months before Mr. Vasquez left that employment in August or September. This was also the time that he noticed Mr. Alexander walking differently and also the time that he, Mr. Vasquez, began doing all the heavy work. His testimony indicates that all of these events occurred simultaneously, immediately after the incident.

Mr. Alexander obtained approval of the trial court to be evaluated by orthopedist Dr. Kevin McCarthy on April 3, 2013. At that time he complained of lower back pain, burning in the right calf, stabbing and burning in the left leg and

foot, and numbness in the hands. For the first time, he complained of having neck pain immediately after picking up on the carousel in February 2012. He also admitted that he had fallen twice in the last two months. Dr. McCarthy's report indicated that he had not yet seen the incident report or the Huey P. Long records, but he related Mr. Alexander's condition to the carousel incident based upon the history given him by Mr. Alexander. However, Dr. McCarthy's concerns were the cervical and thoracic areas of Mr. Alexander's spine, not his lower back. He diagnosed probable cervical stenosis and cervical myelopathy. Dr. McCarthy did not give deposition or trial testimony.

## The Trial Court's Conclusions

The trial court stated that the case was about credibility. The judge noticed at trial in June 2013 that Mr. Alexander did not have a limp, and he found that the medical records did not match the complaints. He found the testimony of family members inconsistent. He applied *Bruno*, 593 So.2d 357, and found that the medical evidence and post-accident circumstances did not support a compensable work-related injury. Because the court opined that Mr. Alexander's problems were degenerative and mentioned his age and his use of alcohol and tobacco, Mr. Alexander asserts that the judge substituted his own opinion for that of Dr. McCarthy. We disagree.

It is the function of the workers' compensation judge to assess the weight he gives to lay and medical testimony, and the court can accept or reject the opinion of a medical expert depending upon the court's impression of the expert's qualifications, credibility, and testimony. *Cannon v. Hamilton Transp.*, 06-1302 (La.App. 3 Cir. 2/7/07), 948 So.2d 1250. Moreover, the Huey P. Long records

much nearer to the time of the incident support arthritis and degenerative conditions. Even Dr. McCarthy saw degenerative disc disease at L4-5 and L5-S1 with disc space collapse, spondylosis, osteoporosis, and osteophyte formation.

Having reviewed the entire record, we find no manifest error on the part of the trial court. With regard to the appeal of Peerless Cleaners, wherein it seeks sanctions for Mr. Alexander's allegedly frivolous appeal, we must decline. The appeal is not so devoid of merit that it justifies the label of frivolous. *See Broussard v. Union Pac. Resources Co.*, 00-1079 (La.App. 3 Cir. 1/31/01), 778 So.2d 1199, *writ denied*, 01-589 (La. 4/27/01), 791 So.2d 118.

## V.

### CONCLUSION

Based upon the foregoing, we affirm the judgment of the Office of Workers' Compensation. Costs of this appeal are assessed to the claimant, Mr. Cleo Alexander.

**AFFIRMED**.

12